**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CECILIA L. BARNES,
        *Plaintiff-Appellant,*

v.

YAHOO!, INC., a Delaware Corp.,
        *Defendant-Appellee.*

No. 05-36189

D.C. No.
CV-05-00926-AA

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, District Judge, Presiding

Argued and Submitted
October 14, 2008—Portland, Oregon

Filed May 7, 2009
Amended June 22, 2009

Before: Diarmuid F. O'Scannlain, Susan P. Graber, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge O'Scannlain

7411

**COUNSEL**

Thomas R. Rask, III, Kell, Alterman & Runstein LLP, Portland, Oregon, argued the cause for the appellant and filed briefs. Denise N. Gorrell, Kell, Alterman & Runstein LLP, Portland, Oregon, was also on the briefs.

Patrick J. Carome, Wilmer, Cutler, Pickering, Hale and Dorr LLP, Washington, D.C., argued the cause for the appellee and filed the brief; Samir Jain and C. Colin Rushing, Wilmer, Cutler, Pickering, Hale and Dorr LLP, Washington, D.C., and Reginald Davis and Eulonda Skyles, of Counsel for Yahoo!, Inc., Sunnyvale, California, were also on the brief.

**ORDER**

**I**

The opinion filed in this case on May 7, 2009, is amended as follows.

Delete Part II.

At page 5318 of the slip opinion, line 5, change <III> to <II>

At page 5320 of the slip opinion, replace the text of footnote 4 with the following:

<We limit our restatement of section 230(c)(1) to state law claims because we deal in this case with state law claims only. We have held that the Amendment's protection also extends to federal law causes of action, *see, e.g.*, *Fair Housing Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157 (9th Cir. 2008) (en banc) (applying the Amendment to a cause of action under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*). Because no federal law cause of action is present in this case, we need not decide how or whether our discussion of section 230(c)(1) would change in the face of such a federal claim.>

At page 5323 of the slip opinion, line 11, change <IV> to <III>

At page 5330 of the slip opinion, line 1, change <V> to <IV>

At page 5335 of the slip opinion, line 24, change <VI > to <V>

## II

The motion to become amici curiae and file a brief as amici curiae, filed on May 20, 2009, by Public Citizen, the Center for Democracy and Technology, the Citizen Media Law Project, and the Electronic Frontier Foundation, is GRANTED. The motion for leave to file a brief as amicus brief, filed on June 1, 2009, by Xcentric Ventures, LLC, is GRANTED.

The panel has unanimously voted to deny Plaintiff-Appellant's petition for rehearing or for rehearing en banc. The panel has also unanimously voted to deny Defendant-Appellee's petition for rehearing and for rehearing en banc. The full court has been advised of the petitions for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petitions for rehearing and for rehearing en banc are DENIED. No further petitions for rehearing or rehearing en banc may be filed.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether the Communications Decency Act of 1996 protects an internet service provider from suit where it undertook to remove from its website material harmful to the plaintiff but failed to do so.

### I

This case stems from a dangerous, cruel, and highly indecent use of the internet for the apparent purpose of revenge.[1]

In late 2004, Cecilia Barnes broke off a lengthy relationship with her boyfriend. For reasons that are unclear, he responded

---

[1] The parties agree that, as this appeal comes to us on grant of a motion for dismissal under Federal Rule of Civil Procedure 12(b)(6), we accept as true the facts alleged in the complaint and construe them in the light most favorable to the plaintiff. *Anderson v. Clow* (*In re Stac Electronics Securities Litig.*), 89 F.3d 1399, 1403 (9th Cir. 1996) (also noting that "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim" (internal quotation marks omitted)). Yahoo has indicated that it would "hotly contest[ ]" the factual allegations of the complaint if it is not dismissed.

by posting profiles of Barnes on a website run by Yahoo!, Inc. ("Yahoo"). According to Yahoo's Member Directory, "[a] public profile is a page with information about you that other Yahoo! members can view. You[r] profile allows you to publicly post information about yourself that you want to share with the world. Many people post their age, pictures, location, and hobbies on their profiles." Through Yahoo's online service, computer users all over the country and the world can view such profiles.

Barnes did not authorize her now former boyfriend to post the profiles, which is hardly surprising considering their content. The profiles contained nude photographs of Barnes and her boyfriend, taken without her knowledge, and some kind of open solicitation, whether express or implied is unclear, to engage in sexual intercourse. The ex-boyfriend then conducted discussions in Yahoo's online "chat rooms," posing as Barnes and directing male correspondents to the fraudulent profiles he had created. The profiles also included the addresses, real and electronic, and telephone number at Barnes' place of employment. Before long, men whom Barnes did not know were peppering her office with emails, phone calls, and personal visits, all in the expectation of sex.

In accordance with Yahoo policy, Barnes mailed Yahoo a copy of her photo ID and a signed statement denying her involvement with the profiles and requesting their removal. One month later, Yahoo had not responded but the undesired advances from unknown men continued; Barnes again asked Yahoo by mail to remove the profiles. Nothing happened. The following month, Barnes sent Yahoo two more mailings. During the same period, a local news program was preparing to broadcast a report on the incident. A day before the initial air date of the broadcast, Yahoo broke its silence; its Director of Communications, a Ms. Osako, called Barnes and asked her to fax directly the previous statements she had mailed. Ms. Osako told Barnes that she would "personally walk the statements over to the division responsible for stopping unautho-

rized profiles and they would take care of it." Barnes claims to have relied on this statement and took no further action regarding the profiles and the trouble they had caused. Approximately two months passed without word from Yahoo, at which point Barnes filed this lawsuit against Yahoo in Oregon state court. Shortly thereafter, the profiles disappeared from Yahoo's website, apparently never to return.

Barnes' complaint against Yahoo is somewhat unclear, but it appears to allege two causes of action under Oregon law. First, the complaint suggests a tort for the negligent provision or non-provision of services which Yahoo undertook to provide. As Barnes pointed out in her briefs, Oregon has adopted section 323 of the Restatement (Second) of Torts (1965), which describes the elements of this claim. For the sake of brevity, we refer to this tort, which is really a species of negligence, as a "negligent undertaking." Barnes also refers in her complaint and in her briefs to Yahoo's "promise" to remove the indecent profiles and her reliance thereon to her detriment. We construe such references to allege a cause of action under section 90 of the Restatement (Second) of Contracts (1981).

After Yahoo removed the action to federal court, it moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). Yahoo contended that section 230(c)(1) of the Communications Decency Act ("the Act") renders it immune from liability in this case. *See* 47 U.S.C. § 230(c)(1). The district court granted the motion to dismiss, finding that the Act did in fact protect Yahoo from liability as a matter of law. Barnes timely appealed, claiming that, in the first place, the so-called immunity under section 230(c) did not apply to the cause of action she has brought and that, even if it did, Yahoo did not fit under the terms of such immunity.

## II

The district court dismissed Barnes' claim on the ground that section 230(c)(1) makes Yahoo "immune" against any

liability for the content that Barnes' former boyfriend had posted. We begin by analyzing the structure and reach of the statute itself.

A

**[1]** Section 230 of the Act, also known as the Cox-Wyden Amendment ("the Amendment"), protects certain internet-based actors from certain kinds of lawsuits. The Amendment begins with a statement of findings and a statement of policy, in subsections 230(a) and (b), respectively. These are rather general, but they illustrate Congress' appreciation for the internet as a "forum for a true diversity of . . . myriad avenues for intellectual activity," which "ha[s] flourished . . . with a minimum of government regulation." § 230(a)(3)-(4). The statute's "policy" includes the promotion of interactive computer services and the "vibrant and competitive free market" for such services, as well as the encouragement of "blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." § 230(b)(1)-(2) & (4)-(5). We have recognized in this declaration of statutory purpose two parallel goals. The statute is designed at once "to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material." *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003).

**[2]** Though we keep these goals, which the statutory language declares, in mind, we must closely hew to the text of the statutory bar on liability in construing its extent. The operative section of the Amendment is section 230(c), which states in full:

> (c) Protection for "good samaritan" blocking and screening of offensive material
>
> (1)   Treatment of publisher or speaker

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2)   Civil liability

No provider or user of an interactive computer service shall be held liable on account of—

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

**[3]** Section 230(c) has two parts. Yahoo relies exclusively on the first part, which bars courts from treating certain internet service providers as publishers or speakers. Looking at the text, it appears clear that neither this subsection nor any other declares a general immunity from liability deriving from third-party content, as Yahoo argues it does. "Subsection (c)(1) does not mention 'immunity' or any synonym." *Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 669 (7th Cir. 2008). Our recent *en banc* decision in *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, rested not on broad statements of immunity but rather on a careful exegesis of the statutory language. 521 F.3d 1157, 1171 (9th Cir. 2008) (en banc) (noting that to "provid[e] immunity every time a website uses data

initially obtained from third parties would eviscerate [the statute]"[2]).

**[4]** Following this approach, one notices that subsection (c)(1), which after all is captioned "Treatment of publisher or speaker," precludes liability only by means of a definition. "No provider or user of an interactive computer service," it says, "*shall be treated* as the publisher or speaker of any information provided by another information content provider." § 230(c)(1) (emphasis added). Subsection 230(e)(3) makes explicit the relevance of this definition, for it cautions that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."[3] Bringing these two subsections together, it appears that subsection (c)(1) only protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action,[4] as a publisher or speaker (3) of information provided by another information content provider.

**[5]** Barnes did not contest in the district court that Yahoo is a provider of an interactive computer service, and we have no trouble concluding that it qualifies as one.[5] Nor is there any

---

[2]*Roommates* interpreted a different subsection of the Amendment, § 203(f)(3), but its approach remains instructive.

[3]Conversely, "[n]othing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section." § 230(e)(3).

[4]We limit our restatement of section 230(c)(1) to state law claims because we deal in this case with state law claims only. We have held that the Amendment's protection also extends to federal law causes of action, *see, e.g.*, *Fair Housing Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157 (9th Cir. 2008) (en banc) (applying the Amendment to a cause of action under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*). Because no federal law cause of action is present in this case, we need not decide how or whether our discussion of section 230(c)(1) would change in the face of such a federal claim.

[5]Section 230 helpfully defines "interactive computer service" as "any information service, system, or access software provider that provides or

dispute that the "information content"—such as it is—at issue in this case was provided by another "information content provider."[6] The flashpoint in this case is the meaning of the "publisher or speaker" part of subsection (c)(1), and that is where we train our sights.

B

**[6]** By its terms, then, section (c)(1) only ensures that in certain cases an internet service provider[7] will not be "treated" as the "publisher or speaker" of third-party content for the purposes of another cause of action. The question before us is how to determine when, for purposes of this statute, a plaintiff's theory of liability would treat a defendant as a publisher or speaker of third-party content.

The cause of action most frequently associated with the cases on section 230 is defamation. *See, e.g., Carafano*, 339 F.3d 1119; *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003). This is not surprising, because, as we and some of our sister circuits have recognized, Congress enacted the Amendment in part to respond to a New York state court decision, *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y.

---

enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." § 230(f)(2).

[6]The statute also tells us that this term "means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." § 230(f)(3). We have recently reiterated that "providing *neutral* tools to carry out what may be unlawful or illicit . . . does not amount to 'development' " for these purposes, *Roommates*, 521 F.3d at 1169; thus it is crystal clear that Yahoo is not an "information content provider" of the profiles.

[7]Subsection 230(c)(1) also refers to interactive computer service users, which we do not mention further because such reference is irrelevant to this case.

Sup. Ct. May 24, 1995) (unpublished), which held that an internet service provider could be liable for defamation. *See e.g., Roommates*, 521 F.3d at 1163; *see also Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997).

[7] But "a law's scope often differs from its genesis," *Craigslist*, 519 F.3d at 671, and the language of the statute does not limit its application to defamation cases. Indeed, many causes of action might be premised on the publication or speaking of what one might call "information content." A provider of information services might get sued for violating anti-discrimination laws, *see, e.g., Roommates*, 521 F.3d 1157; for fraud, negligent misrepresentation, and ordinary negligence, *see, e.g., Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008), *cert. denied*, 129 S. Ct. 600; for false light, *see, e.g., Flowers v. Carville*, 310 F.3d 1118 (9th Cir. 2002); or even for negligent publication of advertisements that cause harm to third parties, *see Braun v. Soldier of Fortune Magazine, Inc.*, 968 F.2d 1110 (11th Cir. 1992). Thus, what matters is not the name of the cause of action—defamation versus negligence versus intentional infliction of emotional distress —what matters is whether the cause of action inherently requires the court to treat the defendant as the "publisher or speaker" of content provided by another. To put it another way, courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a "publisher or speaker." If it does, section 230(c)(1) precludes liability.

[8] We have indicated that publication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content. *See Roommates*, 521 F.3d at 1170-71 ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230."). We need not perform any intellectual gymnastics to arrive at this result, for it is rooted in the common sense and common definition of what a publisher does. One dictionary defines "publisher," in

relevant part, as "the reproducer of a work intended for public consumption" and also as "one whose business is publication." *See* Webster's Third New International Dictionary 1837 (Philip Babcock Gove ed., 1986). Thus, a publisher reviews material submitted for publication, perhaps edits it for style or technical fluency, and then decides whether to publish it.[8] *See also Zeran*, 129 F.3d at 330 (listing "deciding whether to publish, withdraw, postpone or alter content" as examples of "a publisher's traditional editorial functions").

## III

Which leads us to whether Barnes, in her negligent undertaking claim, seeks to treat Yahoo as a "publisher or speaker" of the indecent profiles in order to hold Yahoo liable.

## A

The Oregon law tort that Barnes claims Yahoo committed derives from section 323[9] of the Restatement (Second) of Torts, which states: One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

   (a)   his failure to exercise such care increases the risk of such harm, or

---

[8]As we pointed out in *Batzel*, it is immaterial whether this decision comes in the form of deciding what to publish in the first place or what to remove among the published material. 333 F.3d at 1032. This is particularly so in the context of the internet, where material can be "posted" and "unposted" with ease.

[9]We do not decide in this appeal whether Barnes has properly alleged this cause of action under Oregon law.

(b)  the harm is suffered because of the other's reliance upon the undertaking.

Barnes argues that this tort claim would not treat Yahoo as a publisher. She points to her complaint, which acknowledges that although Yahoo "may have had no initial responsibility to act, once [Yahoo,] through its agent, undertook to act, [it] must do so reasonably." According to Barnes, this makes the undertaking, not the publishing or failure to withdraw from publication, the source of liability. Under this theory, Barnes' cause of action would evade the reach of section 230(c) entirely because it treats Yahoo not as a publisher, but rather as one who undertook to perform a service and did it negligently.

**[9]** We are not persuaded. As we implied above, a plaintiff cannot sue someone for publishing third-party content simply by changing the name of the theory from defamation to negligence. Nor can he or she escape section 230(c) by labeling as a "negligent undertaking" an action that is quintessentially that of a publisher. The word "undertaking," after all, is meaningless without the following verb. That is, one does not merely undertake; one undertakes *to do* something. And what is the undertaking that Barnes alleges Yahoo failed to perform with due care? The removal of the indecent profiles that her former boyfriend posted on Yahoo's website. But removing content is something publishers do, and to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher of the content it failed to remove. *See Craigslist*, 519 F.3d at 671 (finding defendant protected because "only in a capacity as publisher could [the defendant] be liable under § 3604(c) [of the Fair Housing Act]"). In other words, the duty that Barnes claims Yahoo violated derives from Yahoo's conduct as a publisher—the steps it allegedly took, but later supposedly abandoned, to de-publish the offensive profiles. It is because such conduct is *publishing conduct* that we have insisted that section 230 protects from liability "any activity that can be boiled down to deciding whether to

exclude material that third parties seek to post online." *Roommates*, 521 F.3d at 1170-71.

Although the tort of defamation is not the only form of liability for publishers to which subsection (c)(1) applies, its reach confirms our conclusion. Indeed, we note that Yahoo could be liable for defamation for precisely the conduct of which Barnes accuses it. Defamation law sometimes imposes "an affirmative duty to remove a publication made by another." Prosser and Keaton on Torts § 113, at 803. Courts have applied this principle, including in a case that reads like a low-tech version of the situation before us. In *Hellar v. Bianco*, 244 P.2d 757, 758 (Cal. Ct. App. 1952), a woman received a phone call from a man who sought to arrange an unconventional, but apparently amorous, liaison. *Id.* at 758. After being rebuffed, the man informed the woman that her phone number appeared on the bathroom wall of a local bar along with writing indicating that she "was an unchaste woman who indulged in illicit amatory ventures." *Id.* The woman's husband promptly called the bartender and demanded he remove the defamatory graffito, which the bartender said he would do when he got around to it. *Id.* at 758-59. Shortly thereafter, the husband marched to the bar, policeman in tow, and discovered the offending scrawl still gracing the wall. *Id.* at 759. He defended his wife's honor by suing the bar's owner.

**[10]** The California Court of Appeal held that it was "a question for the jury whether, after knowledge of its existence, [the bar owner] negligently allowed the defamatory matter to remain for so long a time as to be chargeable with its republication." *Id.* at 759. This holding suggests that Yahoo could have been sued under our facts for defamation, one of the elements of which is publication, which strongly confirms our view that section 230(c)(1) bars this lawsuit.[10]

---

[10]*Hellar* is not an anomaly, but of a piece with a longstanding theory of defamation liability. *See Byrne v. Dean*, (1937) 1 K.B. 818; *Tidmore*

B

Barnes argues that, even if subsection 230(c)(1) applies to this tort in a general sense, it does not cover her claim because she is suing Yahoo as a distributor, not as a publisher. This argument asks us to join an ongoing academic debate, which has developed in response to the Fourth Circuit's *Zeran* opinion, on whether "publisher" in subsection 230(c)(1) means only "primary publisher" or both "primary publisher" and "distributor," also known as a "secondary publisher," for purposes of defamation liability.

To understand this debate, we briefly sketch the liability of publishers and distributors in defamation law. One of the elements of the tort of defamation is "publication" of the defamatory matter, which simply means "communication intentionally or by a negligent act to one other than the person defamed." Restatement (Second) of Torts § 577(1) (1965). It is well established that "[e]very repetition of the defamation is a publication in itself," whether or not the person repeating the defamation attributes it to its source. Prosser & Keaton § 113, at 799. "[E]veryone who takes part in the publication, as in the case of the owner, editor, printer, vendor, or even carrier of a newspaper is charged with publication." *Id.; see also Cianci v. New Times Publ'g Co.*, 639 F.2d 54, 60-61 (2d Cir. 1980) (noting the "black-letter rule that one who republishes a libel is subject to liability just as if he had published it originally" (internal quotation marks omitted)). However, defamation law assigns different requirements of fault in order to hold someone liable for different forms of publication. Hence, it became "necessary to classify participants into three categories: primary publishers, secondary publishers or

---

*v. Mills*, 32 So. 2d 769 (Ala. Ct. App. 1947). *Contra Scott v. Hull*, 259 N.E.2d 160 (Ohio Ct. App. 1970) (accepting the *Byrne* line of cases but distinguishing it on the ground that the writing was on the outside of the proprietor's building and, thus, not [the tenant's] responsibility to remove).

disseminators, and those who are suppliers of equipment and facilities and are not publishers at all." Prosser & Keaton, § 113 at 803. Primary publishers were held to a strict liability standard, whereas secondary publishers were only liable for publishing defamation with actual or constructive knowledge of its defamatory character. *Id.* at 810-11. Secondary publishers came to be known as distributors, *see, e.g., Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135, 139 (S.D.N.Y. 1991).

Pointing to this legal background, Barnes argues that the term "publisher" in section 230(c)(1) refers only to primary publishers and not to secondary publishers or distributors. She argues that because Congress enacted section 230 to overrule *Stratton Oakmont*, which held an internet service provider liable as a primary publisher, not a distributor, the statute does no more than overrule that decision's application of publisher liability. In *Zeran*, the Fourth Circuit rejected a similar argument, concluding that so-called distributor liability is merely a subset of publisher liability for purposes of defamation law. 129 F.3d at 332. We have taken note of this issue before, but have not yet had to rule on it for ourselves. *See Batzel*, 333 F.3d at 1027 n.10 ("We . . . need not decide whether § 230(c)(1) encompasses both publishers and distributors.").

In our view, however, we need not resolve the dispute at all, because it has little to do with the meaning of the statutory language. As noted above, section 230(c)(1) precludes courts from treating internet service providers as publishers not just for the purposes of defamation law, with its particular distinction between primary and secondary publishers, but in general. The statute does not mention defamation, and we decline to read the principles of defamation law into it. In any event, if the reach of section 230(c)(1) were fastened so tightly to the nuances of defamation law, our *Roommates* opinion, which dealt with a lawsuit under the Fair Housing Act, would simply have declared that the provision did not apply because there was no claim of defamation. We will not engage in an analy-

sis so contrary to the reasoning, and even some of the holding, of our precedent.

Nor do we find particularly edifying the debate over the exact reach of *Stratton Oakmont*, the New York case Congress apparently meant to overrule. As the Seventh Circuit has recognized,

> [a]lthough the impetus for the enactment of § 230(c) as a whole was a [decision] holding an information content provider liable, as a publisher, because it had exercised some selectivity with respect to the sexually oriented material it would host for customers, a law's scope often differs from its genesis. Once the legislative process gets rolling, interest groups seek (and often obtain) other provisions.

*Craigslist*, 519 F.3d at 671. Both parties make a lot of sound and fury on the congressional intent of the immunity under section 230, but such noise ultimately signifies nothing. It is the language of the statute that defines and enacts the concerns and aims of Congress; a particular concern does not rewrite the language.

### C

Leaving no stone unturned, Barnes reminds us that the statutory purpose of the Amendment is to encourage websites affirmatively to police themselves, not to provide an excuse for doing nothing. This argument from statutory purpose has more force to it, because section 230(c) is, after all, captioned "Protection for 'good samaritan' blocking and screening of offensive material." *Cf. Roommates*, 521 F.3d at 1163-64. It would indeed be strange for a provision so captioned to provide equal protection as between internet service providers who do nothing and those who attempt to block and screen offensive material. As the Seventh Circuit has recognized, if section (c) did provide equal protection, then "[internet ser-

vice providers] may be expected to take the do-nothing option and enjoy immunity" because "precautions are costly." *GTE Corp.*, 347 F.3d at 660.

**[11]** A closer look at the whole of section 230(c), we believe, makes sense of this apparent contradiction. Subsection (c)(1), by itself, shields from liability all publication decisions, whether to edit, to remove, or to post, with respect to content generated entirely by third parties. Subsection (c)(2), for its part, provides an additional shield from liability, but only for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider . . . considers to be obscene . . . or otherwise objectionable." § 230(c)(2)(A). Crucially, the persons who can take advantage of this liability are not merely those whom subsection (c)(1) already protects, but *any* provider of an interactive computer service. *See* § 230(c)(2). Thus, even those who cannot take advantage of subsection (c)(1), perhaps because they developed, even in part, the content at issue, *see Roommates*, 521 F.3d at 1162-63, can take advantage of subsection (c)(2) if they act to restrict access to the content because they consider it obscene or otherwise objectionable. Additionally, subsection (c)(2) also protects internet service providers from liability not for publishing or speaking, but rather for actions taken to restrict access to obscene or otherwise objectionable content.[11]

Thus, we must reject Barnes' contention that it does violence to the statutory scheme to bar her suit for negligent undertaking. To summarize, we hold that section 230(c)(1) bars Barnes' claim, under Oregon law, for negligent provision of services that Yahoo undertook to provide. The district court properly granted Yahoo's motion to dismiss that cause of action.

---

[11]It might be more straightforward to narrow the meaning of "publisher" liability to include only affirmative acts of publication but not the refusal to remove obscene material. That path, however, is closed to us. *Batzel*, 333 F.3d at 1032.

IV

As we indicated above, Barnes' complaint could also be read to base liability on section 90 of the Restatement (Second) of Contracts, which describes a theory of recovery often known as promissory estoppel. At oral argument, counsel for Barnes acknowledged that its tort claim might be "recast" in terms of promissory estoppel. We think it might, and in analyzing it as such now we add that liability for breach of promise is different from, and not merely a rephrasing of, liability for negligent undertaking.

A

**[12]** Oregon has accepted promissory estoppel as a theory of recovery. *Bixler v. First Nat'l Bank of Or.*, 619 P.2d 895, 898 (Or. Ct. App. 1980) (citing *Schafer v. Fraser*, 290 P.2d 190, 199-206 (Or. 1955)). The "principal criteria" that determine "when action renders a promise enforceable" under this doctrine are: "(1) a promise[;] (2) which the promisor, as a reasonable person, could foresee would induce conduct of the kind which occurred[;] (3) actual reliance on the promise[;] (4) resulting in a substantial change in position." *Id.* at 899.**[12]**

In most states, including Oregon, " '[p]romissory estoppel' is not a 'cause of action' in itself; rather it is a subset of a theory of recovery based on a breach of contract and serves as a substitute for consideration." *Rick Franklin Corp. v. State ex rel. Dep't of Transp.*, 140 P.3d 1136, 1140 n.5 (Or. Ct. App. 2006). "A promise binding under [section 90 of the Restatement] *is* a contract . . . ." Restatement (Second) of Contracts § 90 cmt. d (emphasis added).

---

**[12]**As we analyze here the reach of a federal statute that applies to all fifty states, we discuss the law of contracts generally. However, Oregon law applies to Barnes' contract claim. Any conflict between this discussion and Oregon law is to be resolved, on remand, in favor of Oregon law.

Thus, aside from consideration, ordinary contract principles usually apply.[13] Just as "[c]ontract law is designed to protect the expectations of the contracting parties," 1 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 1.1 (4th ed. 2007), so is promissory estoppel. Similarly, the majority rule in this country is that "any promise which is to serve as the basis for a promissory estoppel claim or defense [ ] be as clear and well defined as a promise that could serve as an offer, or that otherwise might be sufficient to give rise to a traditional contract supported by consideration." 1 Williston & Lord, *supra* § 8.7; *see also id.* § 8.6 ("there must be a promise, gratuitous at least in the sense that there is no consideration to make it binding").

This philosophy is reflected in the so-called "promissory nature" of contract. *Id.* It is no small thing for courts to enforce private bargains. The law justifies such intervention only because the parties manifest, ex ante, their mutual desire that each be able to call upon a judicial remedy if the other should breach. Thus the Restatement defines a promise as "a *manifestation of intention* to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." Restatement (Second) of Contracts § 2(1) (emphasis added). "A promisor manifests an intention if he believes or has reason to believe that the promisee will infer that intention from his words or conduct." *Id.* § 2 cmt. b.

**[13]** Such, then, is the promise that promissory estoppel requires: one that the promissor intends, actually or construc-

---

[13]One area where promissory estoppel does vary ordinary contract principles is in the damages. Although "full-scale enforcement by normal remedies is often appropriate," Restatement (Second) of Contracts § 90 comment d, some courts have awarded damages to compensate the promisee for his expected benefit (ordinary contract damages), while others have awarded damages to compensate the promisee for his detrimental reliance, *see Jackson v. Morse*, 871 A.2d 47, 52-53 (N.H. 2005) (collecting cases).

tively, to induce reliance on the part of the promisee. From such intention courts infer the intention that the promise be legally enforceable. Thus, when A sues B for breach of contract, A is alleging that B violated an obligation that B intended to be legally enforceable. In promissory estoppel cases, courts simply infer that intention not from consideration but from a promise that B could have foreseen would induce A's reliance.

### B

Against this background, we inquire whether Barnes' theory of recovery under promissory estoppel would treat Yahoo as a "publisher or speaker" under the Act.

**[14]** As we explained above, subsection 230(c)(1) precludes liability when the duty the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker. In a promissory estoppel case, as in any other contract case, the duty the defendant allegedly violated springs from a contract—an enforceable promise—not from any non-contractual conduct or capacity of the defendant. *See GTE Corp.*, 347 F.3d at 662 ("Maybe [the] plaintiffs would have a better argument that, *by its contracts* . . . , [the defendant] assumed a duty to protect them."). Barnes does not seek to hold Yahoo liable as a publisher or speaker of third-party content, but rather as the counter-party to a contract, as a promisor who has breached.

How does this analysis differ from our discussion of liability for the tort of negligent undertaking? *See supra* pp. at 5323-25. After all, even if Yahoo did make a promise, it promised to take down third-party content from its website, which is quintessential publisher conduct, just as what Yahoo allegedly undertook to do consisted in publishing activity. The difference is that the various torts we referred to above each derive liability from behavior that is identical to publishing or speaking: publishing defamatory material; publishing

material that inflicts emotional distress; or indeed attempting to de-publish hurtful material but doing it badly. To undertake a thing, within the meaning of the tort, *is* to do it.

Promising is different because it is not synonymous with the performance of the action promised. That is, whereas one cannot undertake to do something without simultaneously doing it, one can, and often does, promise to do something without actually doing it at the same time. Contract liability here would come not from Yahoo's publishing conduct, but from Yahoo's manifest intention to be legally obligated to do something, which happens to be removal of material from publication. Contract law treats the outwardly manifested intention to create an expectation on the part of another as a legally significant event. That event generates a legal duty distinct from the conduct at hand, be it the conduct of a publisher, of a doctor, or of an overzealous uncle.[14]

Furthermore, a court cannot simply infer a promise from an attempt to de-publish of the sort that might support tort liabil-

---

[14]We are aware of some potentially countervailing history. Both promissory estoppel and ordinary breach of contract actions evolved from the common law writ of assumpsit. J. B. Ames, *The History of Assumpsit*, 2 Harv. L. Rev. 1, 2-4 (1888). Assumpsit originally sounded in tort, for only formal contracts were enforceable as such until the refinement of the doctrine of consideration. *Id.* at 15-17; 1 Williston & Lord, *supra* § 1.16. The tort of negligent undertaking is the vestige of this original tort; promissory estoppel, too, retains some of the originally delictual nature of assumpsit. *Cf. Schafer v. Fraser*, 290 P.2d at 205-06; 1 Williston & Lord, *supra* § 8.1. Indeed, "it is not uncommon under modern rules of pleading for a plaintiff to assert one count based upon negligent failure to perform a gratuitous undertaking [under Restatement (Second) of Torts section 323] and another based upon promissory estoppel." 1 Williston & Lord, *supra* § 8.1.

All the same, we believe the distinction we draw is sound. Though promissory estoppel lurks on the sometimes blurry boundary between contract and tort, its *promissory* character distinguishes it from tort. That character drives our analysis here and places promissory estoppel beyond the reach of subsection 230(c)(1).

ity under section 323 of the Restatement (Second) of Torts. For, as a matter of contract law, the promise must "be as clear and well defined as a promise that could serve as an offer, or that otherwise might be sufficient to give rise to a traditional contract supported by consideration." 1 Williston & Lord, *supra* § 8.7. "The formation of a contract," indeed, "requires a meeting of the minds of the parties, a standard that is measured by the objective manifestations of intent by both parties to bind themselves to an agreement." *Rick Franklin Corp.*, 140 P.3d at 1140; *see also Cosgrove v. Bartolotta*, 150 F.3d 729, 733 (7th Cir. 1998) (noting that if "[a] promise [ ] is vague and hedged about with conditions . . . . [the promisee] cannot plead promissory estoppel."). Thus a general monitoring policy, or even an attempt to help a particular person, on the part of an interactive computer service such as Yahoo does not suffice for contract liability. This makes it easy for Yahoo to avoid liability: it need only disclaim any intention to be bound. *See Workman v. United Parcel Serv. Inc.*, 234 F.3d 998, 1001 (7th Cir. 2000) ("[C]onsideration or reliance is a necessary but not a sufficient condition of the enforceability of a promise. Another necessary condition is that the promise be worded consistently with its being intended to be enforceable.").

[15] One might also approach this question from the perspective of waiver.[15] The objective intention to be bound by a promise—which, again, promissory estoppel derives from a promise that induces reasonably foreseeable, detrimental reliance—also signifies the waiver of certain defenses. A putative promisor might defend on grounds that show that the contract was never formed (the lack of acceptance or a meeting of the minds, for example) or that he could not have intended as the evidence at first suggests he did (unconscionability, duress, or incapacity, for example). Such defenses go

---

[15]Indeed, promissory estoppel developed in part out of cases in which "[p]romises of future action . . . relate[d] to an intended abandonment of an existing right." 1 Williston & Lord, *supra* § 8.4.

to the integrity of the promise and the intention it signifies; they usually cannot be waived by the agreement they purport to undermine. But once a court concludes a promise is legally enforceable according to contract law, it has implicitly concluded that the promisor has manifestly intended that the court enforce his promise. By so intending, he has agreed to depart from the baseline rules (usually derived from tort or statute) that govern the mine-run of relationships between strangers. Subsection 230(c)(1) creates a baseline rule: no liability for publishing or speaking the content of other information service providers. Insofar as Yahoo made a promise with the constructive intent that it be enforceable, it has implicitly agreed to an alteration in such baseline.

**[16]** Therefore, we conclude that, insofar as Barnes alleges a breach of contract claim under the theory of promissory estoppel, subsection 230(c)(1) of the Act does not preclude her cause of action. Because we have only reviewed the affirmative defense that Yahoo raised in this appeal, we do not reach the question whether Barnes has a viable contract claim or whether Yahoo has an affirmative defense under subsection 230(c)(2) of the Act.

V

For the foregoing reasons, we AFFIRM IN PART, REVERSE IN PART, and REMAND for further proceedings. Each party shall bear its own costs.