Filed 9/25/24  ProcureNet Limited v. Twitter CA1/2
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIRST APPELLATE DISTRICT

# DIVISION TWO

PROCURENET LIMITED et al.,

      Plaintiffs and Respondents,

v.

TWITTER, INC. et al.,

      Defendants and Appellants.

A168426

(San Francisco County
Super. Ct. No. CGC23605843)

Plaintiffs ProcureNet Limited and Gurbaksh Chahal sued Twitter, Inc. and X Corp. (Twitter) for breach of contract.  Plaintiffs alleged that they established accounts on Twitter's online platform, and paid Twitter over $1 million under contracts for advertising to promote the accounts, and that Twitter breached the covenant of good faith and fair dealing implied in the advertising contracts by suspending their online accounts "without adequate justification," thus depriving plaintiffs of the benefit of the advertising they had purchased.

Twitter filed a special motion to strike the complaint under the anti-SLAPP statute (Code Civ. Proc., § 425.16).[1]  The trial court applied the

---

[1] " 'SLAPP' is an acronym for 'strategic lawsuit against public participation.' " (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 381, fn. 1 (*Baral*).) Unless otherwise indicated, all statutory references are to the Code of Civil Procedure.

1

familiar two-step process in its analysis of the anti-SLAPP motion, concluding that although Twitter met its burden in the first step to show that plaintiffs' claims arose from Twitter's protected activity, plaintiffs met their burden in the second step to show their claims had at least minimal merit. (See *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009 (*Bonni*) [describing the two-step process].)  It denied the motion.

Twitter now appeals.  Neither ProcureNet nor Chahal filed a respondent's brief, so we decide the appeal on the record, Twitter's opening brief, and Twitter's oral argument.[2]  (Cal. Rules of Court, rule 8.220(a)(2).)  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

A.    *Complaint for Breach of the Implied Covenant of Good Faith and Fair Dealing*

Plaintiffs allege that Chahal and the company he founded, ProcureNet, launched the BNN Breaking News Network (BNN), for which they created a central global account, @BNNBreaking, as well as more than 200 country-specific accounts on Twitter's online platform.  The accounts covered COVID-19 and global breaking news.  ProcureNet also created two "corporate accounts" on Twitter's platform, one for itself and one for a company it owns,

---

[2] After Twitter filed its opening brief on appeal, plaintiffs filed a request in the trial court for dismissal without prejudice of the entire action. The trial court clerk entered the dismissal that same day.  In a subsequent filing in this court, Twitter affirmed its intent to proceed with its appeal, asserting that the purported dismissal is void on its face because the trial court lacked jurisdiction to act while the appeal of the anti-SLAPP motion was pending.  (See *Curtin Maritime Corp. v. Pacific Dredge & Construction, LLC* (2022) 76 Cal.App.5th 651 [trial court lacked jurisdiction to dismiss complaint after notice of appeal from order denying anti-SLAPP motion was filed; dismissal was therefore void on its face and did not moot the appeal].)

2

and two "non-profit accounts" to promote a foundation created by Chahal. Chahal also created a personal account on the platform.

Plaintiffs allege they entered into contracts with Twitter pursuant to which they spent over $1 million for advertisements on Twitter's platform to promote the accounts. The contracts consist of Twitter's "Master Services Agreement" and insertion orders, which plaintiffs refer to collectively as the "Advertising Contracts."[3]

Plaintiffs allege that in June 2022, Twitter suspended all the BNN accounts, claiming that the accounts violated that platform's rules against manipulation and spam. According to plaintiffs, the BNN accounts had not violated any of Twitter's rules, and instead had been the victims of a " 'mass reporting' attack" that was triggered by BNN's reporting on statements made by Lloyd Austin, the United States Secretary of Defense. The attack involved third parties filing large numbers of false complaints about the BNN accounts in order to trigger Twitter's automated systems, which would suspend or remove the targeted accounts. Plaintiffs contacted Twitter's support team with information about what had occurred, and although some accounts were restored, they were soon suspended again. In mid-July 2022, Twitter acknowledged to plaintiffs that some of the BNN accounts had been incorrectly flagged as spam, but those accounts were then once again suspended about two weeks later. By the end of July 2022, a majority of the BNN accounts were suspended. Although plaintiffs allegedly provided Twitter with "objective proof of third-party attacks" and detailed the events that had occurred, Twitter failed to respond.

---

[3] According to plaintiffs' complaint, each advertising campaign is reflected in an "insertion order."

Plaintiffs also allege that starting in October 2022 the non-profit accounts, Chahal's personal account, and the corporate accounts were suspended after they became the object of third-party attacks, and that in each case, Twitter failed to reinstate the accounts despite receiving information from plaintiffs about the third party attacks.

Plaintiffs allege four causes of action against Twitter for breach of the covenant of good faith and fair dealing implied in the Advertising Contracts: one each for the BNN accounts, the corporate accounts, the non-profit accounts, and Chahal's personal account. As to each cause of action, plaintiffs allege Twitter repeatedly breached the covenant of good faith and fair dealing implied in the Advertising Contracts by suspending their accounts "without adequate justification"; by preventing them from using the accounts that the advertising was intended to promote; by "failing to adequately or meaningfully address and consider" their appeals from the suspension of the accounts; by "failing to ensure that all necessary measures were being taken" to safeguard the accounts; and by failing to follow Twitter's own internal rules, policies, and procedures. The result, plaintiffs allege, is that they were deprived of the benefit of the Advertising Contracts and were damaged.

B.  *Anti-SLAPP Motion*

Twitter filed an anti-SLAPP motion supported by an attorney declaration attaching copies of Twitter's Master Services Agreement, User Agreement, Terms of Service, Rules and Policies, and Platform Manipulation and Spam Policy.[4]  Plaintiffs' opposition to the motion was supported by a declaration from Chahal.

---

[4] The record before us does not include the insertion orders that plaintiffs allege are part of the Advertising Contracts. Twitter did not

4

The trial court denied Twitter's motion after a hearing, and this appeal followed.

## DISCUSSION

A.    *Applicable Law and Standard of Review*

Our Supreme Court has explained that "[t]he anti-SLAPP statute is 'designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern. [Citations.]  To that end, the statute authorizes a special motion to strike a claim "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue."  (§ 425.16, subd. (b)(1).)'  [Citation.]  [¶] Litigation of an anti-SLAPP motion involves a two-step process.  First, 'the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged.'  [Citation.]  Second, for each claim that does arise from protected activity, the plaintiff must show that the claim has 'at least "minimal merit" '  [Citation.]  If the plaintiff cannot make this showing, the court will strike the claim."  (*Bonni*, *supra*, 11 Cal.5th at pp. 1008-1009.)

In the first step of the analysis, the defendant must " 'demonstrat[e] that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e).' "  (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88.)  Those categories include "any . . . conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of

provide any insertion orders with its supporting declaration, and plaintiffs allege that they are unable to retrieve the insertion orders because the advertised accounts remain suspended.

free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

The second step of the analysis has been "described . . . as a 'summary-judgment like procedure.' [Citation.] The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.] '[C]laims with the requisite minimal merit may proceed.' " (*Baral*, *supra*, 1 Cal.5th at pp. 384-395, fn. omitted.) In seeking to show that a claim has merit, a plaintiff " 'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.' " (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.)

We review an order denying a motion to strike under section 425.16 de novo. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.) We conduct an independent review of the entire record, " 'draw[ing] "every legitimate favorable inference" from the [anti-SLAPP] plaintiff's evidence.' " (*Roche v. Hyde* (2020) 51 Cal.App.5th 757, 787 (*Roche*).)

B.     *Step One: Protected Activity by Twitter*

In the first step of the anti-SLAPP analysis, Twitter has the burden to demonstrate that plaintiffs' claims arise from protected activity in connection with an issue of public interest. (*Bonni*, *supra*, 11 Cal.5th at p. 1009.) We conclude that burden has been met, as reflected in the trial court's order:

" 'Where, as here, an action directly targets the way a content provider chooses to deliver, present, or publish news content on matters of public interest, that action is based on conduct in furtherance of free speech rights

6

and must withstand scrutiny under California's anti-SLAPP statute.' (*Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.* (9th Cir. 2014) 742 F.3d 414, 424].)

"Here, [plaintiffs] allege that [Twitter] violated the implied covenant of good faith and fear dealing by banning [p]laintiffs' Twitter accounts. This is a challenge to [Twitter's] editorial decisions over its platform, which is protected free speech. (See *O'Handley v. Padilla* (N.D. Cal. 2022) 579 F.Supp.3d 1163, 1186-1187 ['Like a newspaper or news network, Twitter makes decisions about what content to include, exclude, moderate, filter, label, restrict, or promote, and those decisions are protected by the First Amendment.'].)

"Further, the challenged conduct concerns matters of public interest. Plaintiffs' complaint alleges that the account suspensions occurred soon after [p]laintiffs reported on statements made by the U.S. Department of Defense's Secretary Lloyd Austin which 'generated widespread discussion and debate.' (Compl. ¶ 48.) Indeed, other portions of the complaint detail the topics about which [p]laintiffs' accounts made posts, as well as their popularity. (See Compl. ¶¶ 35-41, 87.)"

Accordingly, we move to the second step of the anti-SLAPP analysis.

C.     *Step Two:  Plaintiffs' Probability of Success*

     1.     *Plaintiffs' Theory of the Case*

Relying on the principle that " '[i]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract' " (*Kendall v. Ernest Pestana, Inc.* (1985) 40 Cal.3d 488, 500 (*Kendall*)), plaintiffs argued in the trial court that even though Twitter's Terms of Service, which are purportedly incorporated into the Master

Services Agreement, expressly allow Twitter to suspend user's accounts "for any or no reason," Twitter was nonetheless required to exercise any discretion it may have had to suspend plaintiffs' advertised accounts in good faith and in accordance with fair dealing, which it failed to do. To support their allegations of Twitter's lack of good faith, plaintiffs provided a declaration from Chahal, who stated that plaintiffs did not violate any of Twitter's terms of service, rules, policies or guidelines; plaintiffs presented evidence to Twitter that the accounts had been targeted by third party attacks; Twitter largely ignored plaintiffs' communications; and plaintiffs paid Twitter over $2 million to advertise their accounts, none of which was refunded.

In the trial court, plaintiffs emphasized that they do not challenge Twitter's "right to terminate a free account, devoid of advertising or monetary consideration, based solely on" Twitter's general Terms of Service. (Italics omitted.) Instead, plaintiffs argue that by purchasing advertising from Twitter for their accounts, they acquired rights and reasonable expectations that go beyond the rights of ordinary users of free services from Twitter for which no consideration is paid. Plaintiffs argue that given the existence of the Advertising Contracts, Twitter cannot terminate plaintiffs' accounts if the plaintiffs did not violate any of Twitter's rules.

2. *Twitter's Step-Two Anti-SLAPP Arguments*

Twitter raises four arguments on appeal to support its position that plaintiffs failed to show that their claims have a probability of success. First, plaintiffs' claims are barred by the Communications Decency Act of 1996 (CDA, 47 U.S.C. § 230); second, plaintiffs' implied covenant of good faith claims are precluded by express contract provisions reserving Twitter's right to remove accounts for any or no reason; and third, Twitter's First

8

Amendment right to decide what content it will permit on its platform cannot be waived by an implied contractual provision. Twitter's fourth argument is that even if we reject its first three arguments, we should reverse because plaintiffs failed to meet their evidentiary burden under the anti-SLAPP statute to come forward with admissible evidence of breach of the implied covenant. We decline to reach Twitter's third argument, which was not raised in Twitter's trial court briefs or at the hearing on Twitter's motion. (See *Newton v. Clemons* (2003) 110 Cal.App.4th 1, 11 [" '[g]enerally, issues raised for the first time on appeal which were not litigated in the trial court are waived' "].) We consider Twitter's other arguments in turn.

          a.     *The Communications Decency Act as a Bar to the Claims*

Under the CDA, "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." (47 U.S.C. § 230(c)(1).) The CDA expressly preempts state law claims that are inconsistent with that provision: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." (*Id.* § 230(e)(3).) "Read together these two provisions 'protect from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider.' " (*Murphy v. Twitter, Inc.* (2021) 60 Cal.App.5th 12, 24 (*Murphy*).)

Here, there is no dispute that Twitter is a provider of an interactive computer service. (See *Murphy, supra*, 60 Cal.App.5th at p. 25 [Twitter's platform meets the description of an interactive computer service].) Further, plaintiffs' claims are premised on the suppression of information that plaintiffs themselves provided, rather than information provided by Twitter,

9

which means that the claims concern " 'information provided by another information content provider' " within the meaning of the CDA. (*Id.* at p. 31.)

However, the CDA is a bar to liability only when the duty the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker. (*Barnes v. Yahoo!, Inc.* (9th Cir. 2009) 570 F.3d 1096, 1107 (*Barnes*).) As the *Barnes* court explained, the CDA "creates a baseline rule: no liability for publishing or speaking the content of other information [content] providers." (*Id.* at p. 1108.) But to the extent the provider of an interactive computer service makes "a promise with the constructive intent that it be enforceable, it has implicitly agreed to an alteration in such baseline." (*Id.* at pp. 1108-1109.) Here, the duty Twitter allegedly violated derives from its Advertising Contracts with plaintiffs, not from Twitter's status as a publisher of plaintiffs' content. In other words, as in *Barnes*, plaintiffs "do[ ] not seek to hold [Twitter] liable as a publisher or speaker of third-party content, but rather as the counter-party to a contract, as a promisor who has breached." (*Id.* at p. 1107.) The breach here allegedly consists of a violation of the covenant of good faith and fair dealing implied in the Advertising Contracts.

In arguing that plaintiffs' claims are barred by the CDA, Twitter relies on cases addressing purported contract claims that arise from the alleged failure of an interactive service provider to comply with and enforce its general policies and terms of service. (*Murphy*, *supra,* 60 Cal.App.5th at pp. 22, 29-30 [CDA bars claims alleging Twitter breached its user agreement]; see also *Prager University v. Google LLC* (2022) 85 Cal.App.5th 1022, 1037 [CDA bars claims alleging breach of implied covenant in YouTube's terms of service].) These cases, however, do not address claims that a provider

10

breached a separate enforceable agreement for which consideration was paid, like the Advertising Contracts here.

Plaintiffs here allege that Twitter breached the covenant of good faith and fair dealing implied in the Advertising Contracts, which required Twitter to exercise its discretion to suspend the advertised accounts in good faith. Because plaintiffs do not seek to hold Twitter liable "from any non-contractual conduct or capacity," but instead "as the counter-party to a contract, as a promisor who has breached" (*Barnes*, *supra*, 570 F.3d at p. 1107), the CDA does not bar plaintiffs' claims.

b.    *Express Contract Terms as a Bar to the Claims*

We assume, without deciding, that the Master Services Agreement, which is part of each of the Advertising Contracts, incorporates the provision in Twitter's Terms of Service that Twitter may suspend accounts "for any or no reason," and that the provision applies to advertised accounts. (Plaintiffs argued in the trial court that such incorporation would be procedurally and substantively unconscionable, and we do not address that issue here.) Twitter cites several cases to support its argument that because the Terms of Service expressly give Twitter the discretion to suspend accounts for any or no reason, plaintiffs' implied covenant claims must fail, because plaintiffs seek to use the covenant to vary the express terms of their contracts with Twitter. (See *Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 349-350 [covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement"]; *California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205, 217 [trial court erred in concluding that a $3 fee violated the implied covenant of good faith and fair dealing where the agreement at issue specified the $3 fee].)

11

Plaintiffs' position, as stated in its trial court brief, is that even if Twitter has the right to terminate their accounts without justification, Twitter must exercise that right in good faith. Thus, contrary to Twitter's characterization of their claim, plaintiffs do not seek to vary the express terms of the Advertising Contracts, but instead seek to enforce the covenant of good faith and fair dealing as it applies to those express terms. Plaintiffs contend that although Twitter may have had the right to terminate their accounts, Twitter violated the covenant of good faith and fair dealing by terminating their accounts shortly after plaintiffs paid over $2 million to advertise the accounts, by refusing to consider plaintiffs' evidence of third party attacks on the accounts, by refusing to communicate with plaintiffs, and by refusing to refund any of the money plaintiffs paid for advertising. (See *Carma Developers (California), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 372 (*Carma*) ["The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith"]; *Kendall*, *supra*, 40 Cal.3d at p. 503 ["[i]t is not a rewriting of a contract . . . to recognize the obligations imposed by the duty of good faith and fair dealing, which duty is implied by law in every contract"]; *Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 923 [" 'where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing' "].)

We find it significant that Twitter's argument focuses entirely on the discretion it has reserved in its Terms of Service and downplays the purposes of the contracts at issue in this case, which concern the purchase of advertising from Twitter to promote accounts on Twitter's platform. As our

Supreme Court has explained, "the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and the express terms of the contract," and although it may be "a simple matter to determine whether given conduct . . . is either expressly permitted or at least not prohibited," it may be difficult to "decid[e] whether such conduct . . . is nevertheless contrary to the contract's purposes and the parties' legitimate expectations." (*Carma, supra,* 2 Cal.4th at p. 373.)  This is not a case like *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, on which Twitter relies, where the Court of Appeal concluded there was no breach of the implied covenant as a matter of law.  (*Id.* at p. 1120.)  *Wolf* stands for the proposition that "if the express purpose of the contract is to grant unfettered discretion, and the contract is otherwise supported by adequate consideration, then the [exercise of discretion] is, by definition, within the reasonable expectation of the parties and 'can never violate an implied covenant of good faith and fair dealing.' " (*Id.* at p. 1121.)  The contract in *Wolf* was an agreement that gave defendant the right to use characters from a novel in a wide range of contexts, and by its terms defendant was under no obligation to exercise any or all of the rights granted to it, and could assign or license the rights it acquired as it " 's[aw] fit.' " (*Id.* at p. 1112.)  The purpose of the contract in *Wolf* was to give defendant unfettered discretion to make use of the novel's characters.  But the purpose of the Advertising Contracts here was not to give Twitter discretion—its purpose, as alleged in plaintiffs' complaint, was to buy advertising for plaintiffs' accounts on Twitter's platform.

In short, at this preliminary stage of litigation we do not conclude that plaintiffs' implied covenant claims are barred by the express terms of the Advertising Contracts.[5]

### c. *Plaintiffs' Evidence*

Twitter contends that even if we reject its other arguments, we must reverse the challenged order because plaintiffs failed to meet their burden under the second step of the anti-SLAPP analysis to come forward with admissible evidence that in suspending their accounts Twitter did not exercise its discretion in good faith.

First, Twitter contends that allegations in plaintiffs' complaint constitute binding judicial admissions that preclude plaintiffs from showing that Twitter suspended their accounts in bad faith. At issue are allegations that Twitter informed plaintiffs that the BNN accounts were suspended for violating platform rules; that Twitter's support team engaged with plaintiffs in "marathon exchanges" concerning the suspension of the BNN accounts; that Twitter later restored some BNN accounts but then resuspended them based on Twitter's claims that the accounts were violating platform rules; and that after plaintiffs sent "thousands" of emails to Twitter support, as well as emails to certain Twitter executives and receiving "no meaningful response," Twitter refused to reinstate the accounts, claiming that BNN had engaged in persistent spam activity.

This argument is unpersuasive in the face of Chahal's declaration, based on his personal knowledge, that plaintiffs did not violate any of Twitter's platform rules with respect to any of the suspended accounts; that

---

[5] Because our decision, unlike the trial court's, does not rest on a determination that the Advertising Contracts would be illusory absent an implied covenant, we need not address Twitter's arguments as to that issue.

14

plaintiffs presented Twitter with what they considered "compelling evidence" of third-party attacks on the suspended accounts; and that Twitter did not timely respond to that evidence and ultimately refused to reinstate the accounts. At this stage in the proceedings, that evidence, which we accept as true and from which we draw all reasonable favorable inferences, is enough to show that plaintiffs' claims that Twitter acted in bad faith have at least minimal merit. (*Roche, supra*, 51 Cal.App.5th at p. 787.) Plaintiffs' allegations that *Twitter* claimed the accounts were in violation of the platform's rules are not admissions that defeat plaintiffs' claims, because an allegation that Twitter asserted that it had cause for suspending the accounts does not equate to an allegation that Twitter in fact had cause for acting as it did.

Twitter also argues that Chahal's sworn statements that Twitter suspended plaintiffs' accounts "without cause or justification" lack foundation. But Chahal's statement that the accounts did not violate Twitter's rules supports an inference that Twitter lacked justification or cause for suspending the accounts. Twitter argues that plaintiffs failed to specify the "compelling evidence" they purportedly presented to Twitter that their accounts had been subject to a third-party attack, and that Chahal's declaration does not show he has "personal knowledge of the inner workings and procedures of Twitter." True. Even so, Chahal's declaration and the inferences it supports suffice as evidence to show that plaintiffs' claims have the minimal merit required to survive an anti-SLAPP motion.

## DISPOSITION

The challenged order is affirmed.

_____
Miller, J.

WE CONCUR:


_____
Stewart, P. J.


_____
Desautels, J.


A168426, *ProcureNet Limited et al. v. Twitter, Inc. et al.*