Filed 12/05/2022

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| PRAGER UNIVERSITY, | H047714 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 19CV340667) |
| v. | |
| GOOGLE LLC et al., | |
| Defendants and Respondents. | |

After a United States district court dismissed its federal lawsuit, Prager University filed the present action against Google LLC and its subsidiary, YouTube, LLC, alleging that defendants restricted access to, and third-party advertising on, Prager's YouTube videos due to its political and religious views. Prager's appeal from the superior court's judgment of dismissal turns primarily on the scope of immunity under section 230 of the Communications Decency Act (CDA) (47 U.S.C. § 230)[1] for interactive computer service providers acting as "publishers or speakers" of content provided by others. Although the conduct complained of arises from defendants' exercise of a publisher's traditional editorial functions, Prager variously contends that defendants are themselves information content providers, that defendants by their terms of service and their public pronouncements subjected themselves to liability notwithstanding section 230, and that section 230, to the extent it immunizes defendants from Prager's state law claims, is unconstitutional. We affirm.

---

[1] Undesignated statutory references are to Title 47 of the United States Code.

# I.  BACKGROUND[2]

## A.  *YouTube*

Defendants operate YouTube.com, now "the largest video-sharing website in the world," which "maintains a virtual monopoly over the domestic and international internet video posting markets where users can post, view, and comment on video content."  The vast majority of videos that internet users can post and view on defendants' YouTube platform are free to view.  Defendants generate revenue through YouTube by selling advertisements displayed with videos, by selling subscriptions that allow users to view videos without advertisements and/or to access certain content, and by renting access to videos.

Defendants place "advertising restrictions" on certain videos.  When they do so, it "demonetizes" the video, i.e., prevents the user who posted the video from realizing advertising revenues through the video.  Defendants' stated purpose for imposing advertising restrictions is to ensure that advertisements accompany "advertiser-friendly" content.

Network administrators and individual subscribers can elect to limit user access to YouTube videos using "Restricted Mode."  With Restricted Mode activated on a particular network or account, the users of that network or account are unable to view videos that defendants have designated for restriction.  According to defendants, they use six criteria for determining whether to restrict access to a video:  "(1) Talking about drug use or abuse, or drinking alcohol in videos; (2) Overly detailed conversations about or depictions of sex or sexual activity; (3) Graphic descriptions of violence, violent acts, natural disasters and tragedies, or even violence in the news; (4) Videos that cover

---

[2] In reviewing a trial court order sustaining a demurrer, "we accept the truth of material facts properly pleaded in the operative complaint, but not contentions, deductions, or conclusions of fact or law.  We may also consider matters subject to judicial notice."  (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 924.)

2

specific details about events related to terrorism, war, crime, and political conflicts that resulted in death or serious injury, even if no graphic imagery is shown; (5) Inappropriate language, including profanity; and (6) Video content that is gratuitously incendiary, inflammatory, or demeaning towards an individual or group."

Defendants use an "automated filtering algorithm" to decide whether a video is "suitable" for advertising or should be unavailable to users accessing YouTube through Restricted Mode. Videos may also be restricted pursuant to "human review." Users whose videos have been restricted or demonetized may request human review of decisions made by defendants' automated systems.

**B.** *Prager*

The "University" of its name notwithstanding, Prager states that it "is not an academic institution." Prager's stated mission is to educate the public "about current and historical issues and events of public interest[,] . . . with an emphasis on reaching younger, academic, and student-based audiences." Prager seeks to provide "usually (but not always)[] conservative viewpoints" on public issues. To that end, Prager produces and promotes videos containing "focused discussions" of such issues. Since its inception, Prager has posted more than 250 videos on YouTube.

**C.** *Restraints on Prager's Ability to Monetize its Content*

Defendants have prevented Prager from monetizing or obtaining sponsors for over 50 of its videos by imposing advertising restrictions or by preventing the videos from being accessed in Restricted Mode. Even so, there have been instances in which other YouTube users have posted "copycat" videos that are identical to Prager's restricted videos, and the copycat videos have not been restricted. Prager "undertook an extensive comparative analysis of its videos which were restricted and those on similar topics by different speakers that were not restricted" and reached the conclusion that defendants are imposing restraints on Prager because of its political identity or viewpoints, not the content of its videos. Prager's efforts to informally resolve the matter pursuant to

3

defendants' internal appeals process were unsuccessful, as defendants "admitted that" they conducted " 'human reviews' " on some of Prager's videos, "leaving little doubt that the restrictions and demonetization of Prager['s] videos were not merely the result of an automated algorithm error."

**D.     *Procedural History***

Prager initially filed suit in federal court.  The result of the federal litigation was dismissal of Prager's federal claims for violation of the First Amendment and the Lanham Act with prejudice and dismissal of Prager's state law claims without prejudice. (See *Prager University v. Google LLC* (N.D. Cal. Mar. 26, 2018, No. 17-CV-06064-LHK) 2018 WL 1471939, at p. *14, 2018 U.S. Dist. LEXIS 51000, at p. *45; *Prager University v. Google LLC* (9th Cir. 2020) 951 F.3d 991, 999-1000 (*Prager University*).) Prager initiated the present action while its appeal in the federal action was pending.

Here, Prager alleges four causes of action, as follows.  First, defendants violated article I, section 2 of the California Constitution by restricting Prager's speech in a public forum in an arbitrary, capricious, and/or discriminatory manner pursuant to "subjective, vague, and overbroad criteria" and by blocking viewers' access to Prager's videos. Second, defendants violated the Unruh Act by censoring Prager's speech based on its, and its followers', political identity, religious orientation,[3] and viewpoint.  Third, defendants violated the Unfair Competition Law by violating the California Constitution, the Unruh Act and the Lanham Act and by misleading viewers about the content of Prager's videos by restricting access.  Fourth, defendants breached the covenant of good faith and fair dealing implied in their contracts with Prager by restricting access to and demonetizing its videos, thereby interfering with Prager's right to receive the benefits of the contracts.

---

[3] Prager does not allege what it, or its followers', religious orientation is.  In connection with its preliminary injunction motion, Prager submitted a screenshot of its website, where it states that its "values are Judeo-Christian at their core."

4

The parties filed cross-motions—defendants demurred to the operative complaint and Prager moved for a preliminary injunction. The trial court ruled that the CDA precluded each of Prager's claims, "with the possible exception of those based on [defendants'] own promises and representations[.]" As to those claims, the trial court ruled that Prager could not state a claim for breach of the implied covenant of good faith and fair dealing because the parties' contracts expressly permitted the challenged conduct or a UCL claim under the "fraudulent" prong because defendants' statements were non-actionable puffery and/or Prager lacked standing to challenge them. The trial court addressed the merits of Prager's constitutional claim in the alternative, reasoning that the claim failed for want of state action. Pursuant to those rulings, the trial court sustained the demurrer without leave to amend and denied the motion for preliminary injunction.

This appeal followed.

## II. DISCUSSION

On de novo review of the trial court's order sustaining the demurrer (see *T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162), our conclusion is compelled by section 230(c)(1) and (e)(3) of the CDA. However denominated, Prager's state law causes of action target providers of an interactive computer service in their capacity as publishers restricting access to Prager's information content—i.e., the same "Good Samaritan" screening that Congress has elected to protect from liability under state law. To the extent Prager has pleaded alternative theories of contractual breach and fraudulent business practices to forestall this conclusion, it has neither identified a contractual provision to support the former nor alleged facts establishing standing to prosecute the latter, and it raises no reasonable possibility of curing these defects by amendment. We further reject Prager's argument that the CDA—foreclosing as it does Prager's causes of action against private actors—violates the First and Fourteenth Amendments.

5

**A.     *CDA***

"Congress enacted section 230 'for two basic policy reasons: to promote the free exchange of information and ideas over the internet and to encourage voluntary monitoring for offensive and obscene material.' " (*Hassell v. Bird* (2018) 5 Cal.5th 522, 534 (*Hassell*).)  "The statute contains express findings and policy declarations recognizing the rapid growth of the Internet, the beneficial effect of minimal government regulation on its expansion, and the twin policy goals of 'promot[ing] the continued development of the Internet and other interactive computer services' and 'preserv[ing] the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation.' " (*Murphy v. Twitter, Inc.* (2021) 60 Cal.App.5th 12, 24 (*Murphy*).)  "[T]he provision establishes a subjective standard whereby internet users and software providers decide what online material is objectionable." (*Enigma Software Group USA, LLC v. Malwarebytes, Inc.* (9th Cir. 2019) 946 F.3d 1040, 1044 (*Enigma*).)

Section 230(c)(1), provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  More importantly for our purposes, section 230(e)(3) expressly preempts any state law claims inconsistent with section 230(c)(1)'s unequivocal protection of "providers . . . of an interactive computer service" (service providers) as "publishers or speakers" of content provided by another:  "[N]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  Together, these two provisions of the Act "protect from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." (*Barnes v. Yahoo!, Inc.* (9th Cir. 2009) 570 F.3d 1096, 1100-1101, fns. omitted (*Barnes*).)

6

The California Supreme Court has twice affirmed the breadth of this statutory grant of immunity from state law claims. (*Hassell*, *supra*, 5 Cal.5th at p. 544 [discerning "an intent to shield Internet intermediaries from the burdens associated with defending against state-law claims that treat them as the publisher or speaker of third party content, and from compelled compliance with demands for relief that, when viewed in the context of a plaintiff's allegations, similarly assign them the legal role and responsibilities of a publisher *qua* publisher"]; accord, *id.* at p. 558 (conc. opn. of Kruger, J.) & pp. 567-568 (dis. opn. of Cuellar, J.); *Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 39 (*Barrett*) [section 230(c)(1) and section 230(e)(3), together, "have been widely and consistently interpreted to confer broad immunity against defamation liability for those who use the Internet to publish information that originated from another source"].)

Accordingly, section 230 protects an interactive computer service provider's curation of content on its platform from " ' "claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred." ' (*Barrett*, *supra*, 40 Cal.4th at p. 43, quoting *Zeran* [*v. America Online, Inc.* (4th Cir. 1997) 129 F.3d 327,] 330 [(*Zeran*)]; *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC* (9th Cir. 2008) 521 F.3d 1157, 1170-1171 ['any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230'].)"[4] (*Murphy*, *supra*, 60 Cal.App.5th at pp. 25-26.)

---

[4] Following oral argument, Prager submitted notice of supplemental authority, specifically *Henderson v. The Source of Public Data* (4th Cir. 2022) 53 F.4th 110 (*Henderson*), in which the Fourth Circuit Court of Appeal reinterpreted *Zeran* to conclude, "for § 230(c)(1) protection to apply, we require that liability attach to the defendant on account of some improper content within their publication." (*Id.* at p. 122; contra, *Monsarrat v. Newman* (1st Cir. 2022) 28 F.4th 314, 316, 320 [following *Zeran*'s inclusion of "determining whether to 'publish' certain information" in its list of " 'traditional editorial functions' " in holding that a moderator's decision to copy one

There being no dispute that defendants provide an "[i]nteractive computer service" (§ 230(f)(2)) or that Prager is an "[i]nformation content provider" (§ 230(f)(3)) within the meaning of the CDA, we turn to whether Prager's claims treat defendants as a publisher of Prager's content.

**1.     *Publisher of Information by Another Information Content Provider***

Irrespective of Prager's manner of framing its various causes of action, Prager's complaint first and foremost targets defendants' election to "restrict, restrain, and censor [its] content." In applying section 230(c)(1) and (e)(3), "what matters is not the name of the cause of action . . . what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another. To put it another way, courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.' If it does, section 230(c)(1) precludes liability." (*Barnes*, *supra*, 570 F.3d 1096, 1101-1102.) Whether styled as a violation of the California Constitution's guarantee of free speech and association, the Unruh Act's antidiscrimination provisions, the UCL, or defendants' terms of service, the conduct Prager alleges is injurious consists of defendants' decisions regarding the audience to which videos would be published and whether publication of the videos would include paid advertising. (See *id.* at p. 1103 [duty imposed by negligent undertaking claim derived from Yahoo's conduct as a publisher because the steps it took to depublish offensive profiles were the source of the duty].) Because Prager seeks to hold defendants liable under state law for these editorial publication decisions, section 230(c)(1) and (e)(3) forecloses relief. (See *Barnes*, *supra*,

forum's discussion threads and repost them on a new online platform was a publishing decision "about what content to publish on the new platform"].) *Henderson*'s narrow interpretation of section 230(c)(1) is in tension with the California Supreme Court's broader view (see *Murphy*, *supra*, 60 Cal.App.5th at pp. 24-26 [applying *Barrett* and *Hassell*]), which we follow, absent a contrary ruling by the United States Supreme Court. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450.)

8

570 F.3d at pp. 1100, 1102, 1105; *Murphy*, *supra*, 60 Cal.App.5th at pp. 30, 34; *Lewis*, *supra*, 461 F.Supp.3d at pp. 954-955.)

Prager's contention that defendants are themselves an information content provider—in that they developed algorithms used in determining whether to restrict access to Prager's videos—does nothing to defeat section 230 immunity. Prager pleads no facts from which defendants' use of algorithms would render them providers of information content. What Prager alleges is the use of "an automated filtering algorithm that examines certain 'signals' like the video's metadata, title, and the language used in the video. The algorithm looks for certain 'signals' to determine if rules or criteria are violated so as to warrant segregation in Restricted Mode." To the extent that an automated filtering algorithm is itself information, defendants of course created it; what is also apparent from Prager's pleaded facts, however, is that defendants have not "provided [it] through the Internet or any other interactive computer service" within the meaning of section 230(f)(3), to Prager or anyone else: Prager complains that these "A.I. 'algorithms' and other machine-based . . . review tools"[5] are "*clandestine* filtering tools, . . . embedded with discriminatory and anti-competitive animus-based code, including code that is used to identify and restrict content based on the identity, viewpoint, or topic of the speaker."

Moreover, even assuming defendants' development of algorithms could be deemed the provision of information content, Prager "cannot plead around section 230 immunity by framing these website features as content." (*Dyroff v. Ultimate Software Group, Inc.* (2019) 934 F.3d 1093, 1098 [rejecting claim that algorithms used to analyze

---

[5] Prager suggests in its reply brief that Defendants also "embed metadata in the videos." To the extent that Prager could amend its operative complaint to plead such facts, they are immaterial. Prager's claims involve only Defendants' publishing decisions with respect to Prager's content, not the code or metadata by which those decisions are implemented.

9

and promote user content were themselves content].) "[W]hat matters is whether the claims 'inherently require[] the court to treat the defendant as the "publisher or speaker" of content provided by another.' [Citation.] If they do, then Section 230(c)(1) provides immunity from liability." (*Ibid.*, quoting *Barnes*, *supra*, 570 F.3d at p. 1102.) "Merely arranging and displaying others' content to users . . . through such algorithms . . . is not enough to hold [a service provider] responsible as the 'develop[er]' or 'creat[or]' of that content." (*Force v. Facebook, Inc.* (2d Cir. 2019) 934 F.3d 53, 70 [algorithms that directed inflammatory Hamas postings to personalized newsfeeds of other users did not defeat section 230 immunity from suit for ensuing terrorist attacks].) Prager cites no authority for the proposition that algorithmic restriction of user content—squarely within the letter and spirit of section 230's promotion of content moderation—should be subject to liability from which the algorithmic promotion of content inciting violence has been held immune.

Prager's claims turn not on the creation of algorithms, but on the defendants' curation of Prager's information content irrespective of the means employed: it is not the algorithm but Prager's content which defendants publish (or depublish). To the extent Prager's claims principally rest on allegations that defendants violated a duty under state law to exercise their editorial control in a particular manner, defendants are immune under section 230 from the claims Prager brings in this suit. (See *Murphy*, *supra*, 60 Cal.App.5th at pp. 26, 31.)

We therefore turn to Prager's alternative legal theories for limiting the applicability of section 230 to defendants' exercise of discretion as publisher of Prager's content.

### 2. *Contractual Exemption from CDA Immunity*

Section 230(c)(1) and (e)(3) do not necessarily foreclose contractual claims, however, where a computer service provider has agreed to limit its exercise of editorial discretion according to bargained-for terms and conditions. (See *Murphy*, *supra*, 60

10

Cal.App.5th at pp. 28-30 [discussing *Barnes*].)  From this principle, Prager asserts various theories by which defendants' terms of service would preclude reliance on section 230 immunity as a defense to any of its state law causes of action.  Each of Prager's theories is deficient as a matter of either law or pleading.

### a.  *Waiver of Immunity*

Prager's first three causes of action are plainly not contractual claims, and its mere assertion of a contractual theory of liability as its fourth cause of action does nothing to alter the scope of CDA immunity as to its other claims.  Prager suggests, however, that the California choice-of-law provision in YouTube's Terms of Service (YouTube TOS)[6] implies defendants' tacit agreement to waive CDA immunity as to all claims arising under state law, rather than Prager's agreement that California law would govern claims arising under the contract.  Prager's argument "misapprehends the meaning of the choice-of-law provision.  'Through the Supremacy Clause, U.S. Const. Art. VI, cl. 2, the law of any state includes federal law, and federal law is as much the law of a state "as laws passed by the state legislature." ' [Citation.]  'To the extent that a contractual choice-of-law provision provides that the law of a specific state shall apply, this includes federal law as well as state law.' [Citation.]" (*Divino Grp. LLC v. Google LLC* (N.D. Cal. Sept. 30, 2022, No. 19-CV-04749-VKD) 2022 WL 4625076, at p. *15, 2022 U.S. Dist. LEXIS 180048, at p. *45, quoting *Mudd-Lyman Sales & Serv. Corp. v. United Parcel Service* (N.D. Ill. 2002) 236 F.Supp.2d 907, 910.)  "[T]he normal purpose of such choice-of-law clauses is to determine that the law of one State rather than that of another State will be applicable; they simply do not speak to any interaction between state and federal law." (*Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.* (1989) 489 U.S. 468, 488 (dis. opn. of Brennan, J.).)  Nothing in the choice-of-law provision can be read to

---

[6] The YouTube TOS provides that it "shall be governed by the internal substantive laws of the State of California, without respect to its conflict of laws principles."

11

create a contractual right to subject defendants' content moderation to state law claims without operation of section 230(c)(1). (See *George v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112, 1128 [in the context of a demurrer, courts consider whether a contract is reasonably susceptible to the plaintiff's alleged interpretation].)

We accordingly focus on Prager's fourth cause of action—alleging defendants' breach of the implied covenant of good faith and fair dealing—standing alone.

### b. *Prager's Breach of Contract Claim*

A state claim may not be barred by the CDA where "the duty the defendant allegedly violated springs from a contract—an enforceable promise—not from any non-contractual conduct or capacity of the defendant" as a publisher. (See *Barnes*, *supra*, 570 F.3d at p. 1107; *Murphy*, *supra*, 60 Cal.App.5th at p. 28-29.) But contract formation requires a meeting of the minds: a promise that " 'is vague and hedged about with conditions' " does not suffice. (*Barnes*, *supra*, 570 F.3d at pp. 1106, 1108.) Thus, the Ninth Circuit in *Barnes* opined in dicta that "a general monitoring policy, or even an attempt to help a particular person, . . . does not suffice to create contract liability. This [would] make[] it easy for [a computer service provider] to avoid liability: it need only disclaim any intention to be bound." (*Id*. at p. 1108 [CDA did not preclude promissory estoppel claim based on defendant's breach of its employee's promise to depublish certain content]; see also *Berenson v. Twitter, Inc.* (N.D. Cal. Apr. 29, 2022, No. C 21-09818 WHA) 2022 WL 1289049, at p. *2, 2022 U.S. Dist. LEXIS 78255, at p. *5 [reading *Barnes* to allow breach of contract and promissory estoppel "claims to go forward despite Section 230, so long as they are properly pleaded under state law"].)

The *Murphy* court, and others, have held that the CDA foreclosed liability where plaintiffs have identified no enforceable promise allegedly breached. (See *Murphy*, 60 Cal.App.5th at pp. 29-30.) "Murphy does not allege someone at Twitter specifically promised her they would not remove her tweets or . . . suspend her account. Rather,

12

Twitter's alleged actions in refusing to publish and banning Murphy's tweets . . . 'reflect paradigmatic editorial decisions not to publish particular content' that are protected by section 230." (*Id*. at p. 29; see also *Cross v. Facebook, Inc.* (2017) 14 Cal.App.5th 190, 195-196, 201-202, 206-207 [accord]; *Enhanced Athlete Inc. v. Google LLC* (N.D. Cal. 2020) 479 F.Supp.3d 824, 830, 832-833 (*Enhanced Athlete*) [accord].)  Here, Prager's contractual theories are barred because they are irreconcilable with the express terms of the integrated agreements.

### i. *Express Contractual Terms*

What Prager argues is that its contractual claim is beyond the scope of section 230(c)(1) because defendants are bound by a contractual promise to filter content neutrally.  What Prager alleged, however, is that the parties "entered into written contracts" granting defendants "unfettered[] and unilateral discretion to remove, restrict, demonetize, or de-emphasize content as defendants see fit."  Consistent with that allegation, the written contracts governing Prager's relationship with defendants—limited to YouTube's Terms of Service (YouTube TOS) and Google LLC's AdSense Terms of Service (AdSense TOS), which the trial court judicially noticed without objection— contain no provision purporting to constrain defendants' conduct as publishers.

On appeal, Prager now argues that the YouTube TOS and the AdSense TOS—by virtue of their guidelines for users—impose binding limitations on defendants' activities as publishers of information via "express" "contractual promises to provide [Prager] with identity neutral content moderation and access 'governed by the internal substantive laws of the State of California, without respect to its conflict of laws principles.' "  Setting aside the conflict between Prager's allegations and its appellate arguments, the record belies Prager's revised reading of the contracts.[7]

_____

[7] The trial court granted Defendants' unopposed request for judicial notice of public webpages displaying, among other things, the YouTube TOS and AdSense TOS and considered those documents in ruling on the demurrer.  On appeal, Prager relies on

13

Defendants, according to the YouTube TOS, expressly reserved the rights to "remove Content without prior notice" and "to decide whether Content violates these Terms of Service for reasons other than copyright infringement" and "without prior notice and in its sole discretion, [to] remove such Content and/or terminate a user's account for submitting such material in violation of these Terms of Service."  Similarly, the AdSense TOS expressly permits defendants to "refuse or limit [users'] access to the Services."  Prager does not identify any term in either TOS that would restrict how defendants choose to moderate the content uploaded to YouTube.

Prager instead contends that this contractual reservation of rights is in conflict with defendants' Community Guidelines, which defendants styled as "some common-sense rules that'll help [users who post videos to YouTube] steer clear of trouble."  Users are expected to "take these rules seriously" and to "try to respect the spirit in which they were created."  The Community Guidelines warn that defendants may remove YouTube videos that run afoul of its standards as to nudity or sexual content, harmful or dangerous content, and hateful content.  The Community Guidelines also provide that users may flag content as inappropriate, as a result of which defendants' staff will review the content to assess whether it violates the Community Guidelines.  Though consistent with Prager's assertion that YouTube makes public-facing representations giving the impression that it voluntarily filters the content on its platform using a discrete set of neutral policies, the Community Guidelines in no way purport to bind defendants to publish any given video, or to remove a video only for violation of those guidelines.

Prager likewise contend that defendants, by their "Advertiser-friendly content guidelines" for users, agreed to restrict their discretion under the AdSense TOS.  As with

---

the judicially noticed materials to argue that it has viable contractual claims. Accordingly, we consider the contracts that were before the trial court to assess whether Prager may possess a viable contractual claim that is not barred by the CDA, notwithstanding its allegations regarding the meaning of the contracts.

14

the Community Guidelines, Prager conflates user guidelines with provider duties. Prager does not explain how defendants' illustration in the guidelines of unsuitable content that "will result in a 'limited or no ads' monetization state" confers on users a contractual right that all other user content be monetized. At most, the Advertiser-friendly content guidelines permit users to "request human review of [monetization] decisions made by [defendants'] automated systems." Thus, neither the Community Guidelines nor the Advertiser-friendly guidelines conflict with or limit defendants' express reservation of rights.

Alternatively, Prager contends that defendants' express reservations of rights does not extend to the alleged conduct at issue in this action. In Prager's view, that reservation of rights applies only to platform-wide decisions as to particular content—defendants may only ban a video in all iterations or demonetize a video wherever it appears but are prohibited from restricting "audience reach" or demonetizing a video posted by one user, while failing to demonetize it when posted by another. Leaving aside our doubts as to the viability of Prager's narrow reading of defendants' express reservation of rights, Prager's line of argument presents the more fundamental problem under the CDA. Consistent with the purposes of the CDA and the reasoning of *Barnes* and *Murphy*, the CDA may permit a state law claim concerning publishing activity based on a specific contractual promise, section 230 notwithstanding; this does not mean that the CDA requires an express contractual reservation of publishing discretion as condition precedent to section 230 immunity from state law claims. (See *Barnes*, *supra*, 570 F.3d at p. 1108; *Murphy*, *supra*, 60 Cal.App.5th at pp. 29-30.)

### ii. *Implied Covenant*

Under California law, every contract includes an implied covenant of good faith and fair dealing. (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 371.) But the covenant "exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of

the agreement actually made." (*Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 349, italics omitted (*Guz*).)  The implied covenant cannot " 'impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement.' (*Guz*, at pp. 349-350[.]) . . .  [I]t will not be read into a contract to prohibit a party from doing that which is expressly permitted by the agreement itself.' " (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 554.)  Here, the contracts give defendants "unfettered[] and unilateral discretion to remove, restrict, demonetize, or de-emphasize content as [they] see fit[,]" just as in *Enhanced Athlete*, *supra*, 479 F.Supp.3d 824.  Prager contends that the implied covenant of good faith and fair dealing obligated defendants to make publishing decisions in a manner Prager alleges good faith requires. Prager's contractual claim is thus not for the enforcement of any express promise, but for imposition of a duty that would be at odds with the express reservation of defendants' unfettered discretion in making publishing decisions.  Accordingly, Prager has not identified a viable contractual theory that falls outside the scope of the CDA.

### iii.  *Noncontractual Representations*

Going beyond the contracts, Prager looks to various "promises" it alleges that defendants made through public-facing comments.  But, as Prager variously argues or concedes, the parties entered integrated contracts expressly providing that the written agreements, together with the materials incorporated by reference, constitute the "entire agreement" concerning each relevant service.  Consistent with its concession that the parties entered integrated contracts, Prager has not articulated any basis for treating defendants' public-facing comments as contractual.  (See, generally, *Grey v. American Management Services* (2012) 204 Cal.App.4th 803, 807.)

Prager would also have us rely on email exchanges between its agents and defendants' customer support staff, who attempted to assure Prager that defendants "aim to apply the same standards to everyone and . . . don't censor anyone," while also noting that videos unavailable in Restricted Mode "are still freely available on the platform for

the vast majority of users." While Prager strenuously disputes defendants' good-faith application of the "same standards to everyone," Prager has not tethered these or any of the various public-facing statements alleged in the complaint to its contractual theories of liability. (Compare *Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 310 [elements of promissory estoppel claim]; *Barnes*, *supra*, 570 F.3d at p. 1106.)

Consistent with *Barnes* and *Murphy*, we conclude that defendants' generalized public statements regarding their monitoring and filtering practices do not give rise to a state law contractual obligation to regulate their publishing decisions. (See *Barnes*, *supra*, 570 F.3d at p. 1108; *Murphy*, *supra*, 60 Cal.App.5th at pp. 29-30.)

### iv. *Section 230(e)(2) and Intellectual Property*

Prager's final theory in defense of its contractual claim posits that section 230(c)(1) does not apply because section 230(e)(2) carves out intellectual property law from the scope of the CDA. But the present dispute is not an intellectual property dispute—Prager has not made, or sought leave to make, any claim regarding the licensing provisions in any contract. Even if it were, the availability of such a claim may not be material for CDA purposes. (See *Enigma*, *supra*, 946 F.3d at p. 1053 [section 230(e)(2) exception to immunity for intellectual property disputes was not intended to cover intellectual property claims brought under state law].)

More importantly, pursuant to the YouTube TOS, Prager granted YouTube a "non-exclusive . . . license to use, reproduce, distribute, prepare derivative works of, display, and perform the Content in connection with the Service and [its] business"; it further granted each YouTube user a "non-exclusive license to access [its] Content through the Service, and to use, reproduce, distribute, display, and perform such content as permitted through the functionality of the Service and under these Terms of Service." Those licenses "terminate within a commercially reasonable time after [Prager]

17

remove[s] or delete[s] [its] videos from the Service," an event that Prager does not suggest has occurred.

### 3. *Fraudulent Conduct under the UCL*

"The purpose of the UCL 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.' " (*Solus Industrial Innovations, LLC v. Superior Court* (2018) 4 Cal.5th 316, 340 (*Solus*).) To that end, the UCL " 'provides an equitable means through which both public prosecutors and private individuals can bring suit to prevent unfair business practices and restore money or property to victims of these practices.' " (*Ibid.*, italics omitted.) "The UCL defines 'unfair competition' as 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.' (Bus. & Prof. Code, § 17200.) By proscribing 'any unlawful' business act or practice (*ibid.*), the UCL ' "borrows" ' rules set out in other laws and makes violations of those rules independently actionable. [Citation.] However, a practice may violate the UCL even if it is not prohibited by another statute. Unfair and fraudulent practices are alternate grounds for relief. [Citation.]" (*Zhang v. Superior Court* (2013) 57 Cal.4th 364, 370 (*Zhang*); see also *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1143 (*Korea Supply*) [UCL covers " ' " ' "anything that can properly be called a business practice and that at the same time is forbidden by law" ' " ' "].)

Because each of Prager's theories of defendants' unlawful practices "borrows" from the claims dispatched above that seek to regulate defendants' publishing conduct through a state law cause of action, these UCL theories are likewise barred by section 230. But Prager's theory of UCL liability for *fraudulent* conduct is not subject to section 230 immunity, in that the act that would give rise to liability is not the exercise of publishing discretion itself, but defendants' misrepresentations regarding their exercise of that discretion—that is, misrepresentations about the character of defendants' service. (See *Demetriades v. Yelp, Inc.* (2014) 228 Cal.App.4th 294, 310, 313 [CDA does not

18

apply where "plaintiff seeks to hold Yelp liable for its own statements regarding the accuracy of its filter"].) Prager has not, however, alleged facts supporting its standing to raise this aspect of its UCL challenge.

"Standing under the UCL is . . . limited to those who have 'suffered injury in fact and [have] lost money or property as a result of . . . unfair competition.' (Bus. & Prof. Code, § 17204.) Accordingly, to bring a UCL action, a plaintiff must be able to show economic injury caused by unfair competition. (*Kwikset Corp. v. Superior Court* [(2011) 51 Cal.4th 310, 326 (*Kwikset*).])" (*Zhang*, *supra*, 57 Cal.4th at p. 372.) The remedies available in a UCL action are generally limited to injunctive relief and restitution, but those remedies are cumulative of other remedies. (See *De La Torre v. CashCall, Inc.* (2018) 5 Cal.5th 966, 980; *Solus*, *supra*, 4 Cal.5th at p. 341; *Korea Supply*, *supra*, 29 Cal.4th at p. 1144.)

In the operative pleading, Prager's alleged injuries flowed not from any misrepresentations defendants made about YouTube, but from defendants' making Prager's videos unavailable in Restricted Mode and demonetizing Prager's videos. These allegations are insufficient. To challenge a business practice, a private plaintiff must allege injury in fact caused by the practice in question. (See *Kwikset*, *supra*, 51 Cal.4th at pp. 322, 326.)

Even so, we also consider the theories that have been addressed in the appellate briefing, as they indicate how Prager might amend its complaint if it were given leave to do so. (See *Jane Doe No. 1 v. Uber Technologies, Inc.* (2022) 79 Cal.App.5th 410, 429-430 [considering proposed new allegations raised in appellate reply brief for the purpose of assessing whether there was a reasonable possibility that a pleading defect could be cured by amendment]; *Russell City Energy Co., LLC v. City of Hayward* (2017) 14 Cal.App.5th 54, 69-70 [if a defect in a complaint can reasonably be cured by amendment, "then the judgment of dismissal must be reversed to allow the plaintiff an opportunity to do so"].)

19

The arguments Prager made in opposition to the demurrer in the trial court and before us on appeal confirm that Prager lacks standing to challenge misrepresentations defendants made about YouTube. In the trial court, Prager contended that its UCL claim was based primarily on defendants' alleged misrepresentations regarding their operation YouTube as an open "forum for 'freedom of expression' for all," their use Restricted Mode as a neutral content moderation tool, and the reasons that they restricted access to Prager's videos. In its appellate briefing, Prager stated that the injuries it alleged in its complaint "were directly and proximately 'caused by [defendants'] decisions to restrict and/or demonetize [Prager's] content.' " Prager says that "the harm and injuries alleged flow directly from [defendants'] breaches of the Contracts, not 'from [Prager's] decision to use YouTube.' " In other words, Prager alleges no harm from what the Ninth Circuit has deemed defendants' "lofty but vague statements" of "classic, non-actionable opinions or puffery," only from defendants' exercise of publishing discretion. (See *Prager University*, *supra*, 951 F.3d at p. 1000.)

Accordingly, the standing allegations in the complaint relate to a theory of liability that is foreclosed by the CDA, and Prager has not alleged a basis for standing as to the lone theory it has identified that is beyond the CDA's reach.

### 4. *First and Fourteenth Amendments*

Anticipating our application of section 230 immunity, Prager argues that if section 230 shields discriminatory publishing decisions from liability under state law, then the CDA is perforce unconstitutional as applied.[8] The thrust of Prager's argument appears to be that a court's application of section 230 to bar state law claims targeting a private actor's discriminatory publishing decisions is itself a discriminatory state action because it permits discrimination. As Prager would have it, (1) private discrimination

---

[8] Prager makes no facial challenge to the immunity provisions in the CDA. (See generally *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [distinguishing facial and as-applied challenges].)

based on content or identity discrimination violates state law, so (2) if section 230 immunizes that private content- or identity-based discrimination from state law claims, then (3) section 230 violates the First and Fourteenth Amendments. We decline to endorse this attempt to federalize state law claims and to relitigate First Amendment claims already rejected by the Ninth Circuit in *Prager University*, *supra*, 951 F.3d 991).

To be clear: unlike *Prager University*, the instant case involves only state law claims, which section 230(c)(1) and (e)(3) expressly preempt where inconsistent with the purposes of the CDA. (See *Murphy*, *supra*, 60 Cal.App.5th at p. 24.) Prager's invocation of Title 42, United States Code section 1981 in its appellate briefing does nothing to alter that fact (or our jurisdiction). Congressional authority to preempt state law is well settled under the Supremacy Clause of the United States Constitution. (See *Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935 (*Viva!*).) Section 230(c)(1) and (e)(3) reflect the unambiguous exercise of Congress's constitutional power to preempt state laws.[9] (See *Viva!*, *supra*, 41 Cal.4th at pp. 935-936 [discussing "species" of federal preemption].) We have no authority to subvert the Supremacy Clause by claiming an amorphous constitutional imperative to regulate, through the application of state law causes of action, conduct that the federal government has claimed for its exclusive control. (See *Murphy*, *supra*, 60 Cal.App.5th at p. 24 [describing preemptive effect of section 230(c)(1) and (e)(3)].)

Moreover, YouTube is not a state actor: the dismissal of Prager's federal case against defendants has already established that. (See *Prager University*, *supra*, 951 F.3d at pp. 997-998.) Nor is section 230(c)(1) a "ban or restrict[ion on] any speech." (*Lewis v. Google LLC* (N.D. Cal. 2020) 461 F.Supp.3d 938, 953; see *id.* at p. 952.)

---

[9] We have no occasion to pass upon the constitutionality of section 230(c)(2) because that provision is unnecessary to our resolution of the present dispute. Nor do we reach any other arguments regarding the application of section 230(c)(2) to this case.

21

Relying on *Denver Area Educational Telecommunications Consortium, Inc. v. F.C.C.* (1996) 518 U.S. 727 (*Denver Area*), Prager contends that the CDA is unconstitutional where a private party relies on the statute as a defense against a charge of discriminatory conduct. Prager reads *Denver Area* too broadly. " '[T]he epitome of a splintered opinion,' " *Denver Area* comprises "a majority opinion as to only one issue, plurality opinions as to others, and separate concurring and dissenting opinions," none of which garnered five votes on the issue of state action. (*Roberts v. AT&T Mobility LLC* (9th Cir. 2017) 877 F.3d 833, 840.) Accordingly, " 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds' "—that "state action exists when 'Congress singles out one sort of speech for vulnerability to private censorship in a context where content-based discrimination is not otherwise permitted.' " (*Id.* at pp. 840-841 [applying the "common[-]denominator rule" of *Marks v. United States* (1977) 430 U.S. 188, 193].)

Consistent with the narrow holding properly attributable to *Denver Area*, the United States Supreme Court later reaffirmed that whether a private actor's allegedly unconstitutional conduct "is fairly attributable to the State" requires "careful attention to the gravamen of the plaintiff's complaint." (*American Manufacturers' Mutual Ins. Co. v. Sullivan* (1999) 526 U.S. 40, 51 (*American Manufacturers*).) Even for private businesses that, like the cable system operators in *Denver Area*, are subject to government regulation, " 'the mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment.' " (*Id.* at p. 52.) Rather, there must be " 'a sufficiently close nexus between the State and the challenged action of the regulated entity so that the latter may be fairly treated as that of the State itself.' [Citation.] Whether such a 'close nexus' exists . . . depends on whether the State 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.' [Citation.]" (*Ibid.*)

22

The existence of such a close nexus eludes Prager. State action is absent here, because social media platforms are generally permitted to decide for themselves what content to publish. (See *NetChoice, LLC v. Attorney General, Florida* (11th Cir. 2022) 34 F.4th 1196, 1210, 1221 (*NetChoice*) [social media platforms "like . . . YouTube" regularly make judgments about whether and to what extent they will publish information to their users, and their ability to disseminate some messages but not others is recognized and protected by federal law].) "Unlike the cable systems operators in *Denver Area*, YouTube is not a government-regulated entity charged with providing public broadcasting services. And unlike the statute at issue in *Denver Area,* which permitted cable system operators to ban specific content, Section 230 of the CDA does not single out particular types of speech as suitable for private censorship." (*Divino Group LLC v. Google LLC* (N.D. Cal. Jan. 6, 2021, No. 19-cv-04749-VKD) 2021 WL 51715, at p. *7, 2021 U.S. Dist. LEXIS 3245, at p. *21 (*Divino I*).) Rather, "Section 230 reflects a deliberate *absence* of government involvement in regulating online speech[.] . . . Section 230 does not require private entities to do anything, nor does it give the government a right to supervise or obtain information about private activity." (*Id.*, 2021 WL 51715, at p. *6, 2021 U.S. Dist. LEXIS 3245, at p. *17.) Indeed, state incursions into defendants' discretion to restrict content on its platform may pose a more significant First Amendment concern than defendants' restrictions. (See, e.g., *NetChoice*, *supra*, 34 F.4th at pp. 1209-1210 [content-moderation restrictions applicable to social media platforms in Florida statute were substantially likely to violate the First Amendment].)

Alternatively, Prager analogizes *Shelley v. Kraemer* (1948) 334 U.S. 1—in which the Supreme Court held that judicial enforcement of racially restrictive covenants constituted state action in violation of the Equal Protection clause—and argues that defendants are likewise seeking to enforce a discriminatory contract. Even assuming Prager were capable of amending its complaint to narrow its generic claims of "Protected Identity" to a classification the Fourteenth Amendment treats as suspect, it is Prager that

23

claims a right to enforce what it would prefer to be the terms of the operative contract. This alone divests Prager of any legitimate means of styling itself as the victim of Jim Crow contract enforcement vis-à-vis defendants' limited incursion on Prager's ability to realize ad revenue from YouTube views.

More to the point, the thrust of Prager's argument is that the government has a constitutional mandate to prevent private entities from discriminating on the basis of any protected classification and the failure to do so—that is, the trial court's dismissal of a claim for relief from discrimination—is a state action in violation of that mandate. But the logical corollary of the requirement of state action is the existence and persistence of private discrimination that is beyond the reach of a self-executing constitutional right. Put differently, while Congress can surely enact legislation to prevent and remedy invidious discrimination (see, e.g., 42 U.S.C. § 2000e, et seq.), if it could be said that the Constitution requires Congress to enact antidiscrimination legislation in all private contexts, the state action requirement would be a nullity—the Constitution would effectively ban all discrimination by both public and private actors because state action would always be present. That is not the law. (See, e.g., *Prager University*, *supra*, 951 F.3d at pp. 997-999; *Moose Lodge No. 107 v. Irvis* (1972) 407 U.S. 163, 172-173; see also *Divino I, supra*, 2021 WL 51715, at pp. *6-*7, 2021 U.S. Dist. LEXIS 3245, at pp. *16-*22.)[10]

## B.    *Leave to Amend*

When a demurrer is sustained without leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment . . . ." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*).)  If a reasonable possibility is shown, the trial

---

[10] Consistent with the foregoing, we need not and do not decide whether and to what extent section 230(c)(1) precludes federal claims or to what extent federal law may provide a remedy for the conduct alleged. (See, generally, *Barnes*, 570 F.3d at p. 1100, fn. 4.)

court has abused its discretion. (*Ibid*.)  However, "[t]he burden of proving such reasonable possibility is squarely on the plaintiff." (*Ibid*.)  Prager asserts that "new evidence, admissions, and accusations" about defendants "digital[] profil[ing]" and discrimination have emerged since Prager filed its operative complaint.  Although Prager does not otherwise propose specific amendments to its complaint, Prager argues in its reply brief that it can add allegations that defendants are "content creators" because they embedded metadata and other information in Prager's videos.  Going further, we infer that Prager would amend its complaint to conform with its theories of liability as articulated in its appellate briefing.  Nevertheless, consistent with the foregoing substantive discussion, we discern no reasonable possibility that Prager can cure the essential defects in its complaint.  As Prager has not carried its burden, we conclude that the trial court did not abuse its discretion in denying Prager leave to amend.  (See *ibid*.)

First, Prager has not shown a reasonable possibility that its claims under the California Constitution or the Unruh Act can evade the preemptive effect of the CDA.  Second, consistent with the judicially noticed contract documents, Prager has not shown a reasonable possibility that it can assert viable contractual claims that are outside the scope of the CDA.  Third, Prager has not shown a reasonable possibility that it can allege facts supporting its standing to pursue a UCL claim that is outside the scope of the CDA.  The trial court issued a written ruling that clearly articulated why Prager failed, in its operative complaint, to allege facts supporting its standing to pursue a UCL claim based on defendants' alleged fraudulent misrepresentations.  In its appellate briefing, Prager did not articulate facts that it would allege, if given leave, to support standing.  Rather, Prager, in substance, confirmed that the trial court properly understood its allegations of injury to flow not from the fraudulent misrepresentations, but from defendants' publishing decisions.  Accordingly, Prager has not shown a reasonable possibility that the defects in its complaint can be cured by amendment.

25

## III.    DISPOSITION

We affirm the trial court's entry of judgment pursuant to its order sustaining defendants' demurrer without leave to amend.

_____
LIE, J.


WE CONCUR:




_____
GREENWOOD, P.J.




_____
WILSON, J.




*Prager University v. Google LLC et al.*
H047714

Trial Court:                                   Santa Clara County
                                               Superior Court No.:  19CV340667


Trial Judge:                                   The Honorable Brian C. Walsh


Attorney for Plaintiff and Appellant           Browne George Ross O'Brien
Prager University:                             Annaguey & Ellis LLP

                                               Peter Obstler
                                               Eric M. George
                                               Debi A. Ramos
                                               Ryan Q. Keech


Attorneys for Defendants and Respondents       Wilson Sonsini Goodrich & Rosati
Google LLC et al.:
                                               Fred A. Rowley, Jr.
                                               David H. Kramer
                                               Lauren Gallo White
                                               Amit Q. Gressel


Attorneys for Amicus Curiae                    Electronic Frontier Foundation
Electronic Frontier Foundation:
                                               Mukund Rathi
                                               David A. Greene


*Prager University v. Google LLC et al.*
H047714